Filed 3/28/22  P. v. Norton CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| THE PEOPLE, | C090923 |
| Plaintiff and Respondent, | (Super. Ct. No. SCCRCRF-2018-87-1) |
| v. | |
| MATTHEW EDWARD NORTON, | |
| Defendant and Appellant. | |

Defendant Matthew Edward Norton was convicted by a jury of sexually assaulting his 15-year-old niece, B.S., when she was staying overnight at the house defendant shared with his girlfriend.[1]

---

[1]     Pursuant to California Rules of Court, rule 8.90(b)(4), (10), we identify B.S. by her initials, continuing the procedure followed in the trial court, and others where appropriate by their first names or first name and an initial for the last name.

1

On appeal, defendant contends that the trial court abused its discretion by (1) allowing a witness to testify under Evidence Code section 1108, subdivision (a),[2] that defendant committed an uncharged sex crime, and (2) imposing consecutive sentences for forcible rape (Pen. Code, § 261, subd. (a)(2)) and forcible sexual penetration (Pen. Code, § 289, subd. (a)(1)(A).) We find no abuse of discretion.

Defendant also challenges various fees and fines imposed by the trial court without a finding of his ability to pay them. Defendant contends that imposition of a fee or fine without a finding of ability to pay violates his constitutional rights. We disagree that fines imposed under a statute that does not require consideration of ability to pay are unconstitutional. However, a number of fines are no longer collectible or enforceable under Assembly Bill No. 1869 (2019-2020 Reg. Sess.) and Assembly Bill No. 177 (2021-2022 Reg. Sess.), adopted while this appeal was pending. Those fines will be stricken.

Lastly, defendant contends the abstract of judgment contains a clerical error that the Attorney General agrees should be corrected, as do we.

With these modifications, we affirm the judgment.

## FACTUAL BACKGROUND

**B.S.:** B.S. testified that defendant is her uncle. They were close as a family. She almost considered defendant as a brother. At the time of the assault, B.S. was 15 and defendant was in his late 20s.

B.S. and defendant both lived in Dunsmuir. She would see defendant at family events and go places with him and his girlfriend and their children. B.S. attended softball games where defendant played on a team with his father and brother. Defendant had an infant daughter, Payton, with his girlfriend, Jerilyn M., who had other four children. The children were like cousins to B.S. Sometimes the oldest, Taylor, and B.S. would take

---

[2] All undesignated statutory references are to the Evidence Code.

2

Payton to the park, on walks, or to the river. B.S.'s parents were close but not very close with defendant, celebrating family events like Christmas and Thanksgiving together.

One evening in July 2016, B.S. went to church with her parents and afterwards defendant picked her up with Payton in the car, and they went to defendant's softball game, which lasted until 10:00 or 11:00 at night. They went to Taco Bell, then to defendant's house. Defendant suggested B.S. stay the night at his house to babysit Payton the next day because defendant had to get up early in the morning. Taylor also wanted B.S. to stay the night. When defendant, B.S. and Payton arrived, Taylor was upstairs asleep.

Defendant asked if she wanted to watch a movie with him and Payton. B.S. agreed. They went downstairs to the bedroom defendant shared with Jerilyn and watched the movie. B.S. had been down there before with defendant and Jerilyn. That night Jerilyn was at her home healthcare job, where she sometimes stayed the night with the people under her care.

There was a king-sized bed against one wall and a television at the foot of the bed facing the bed. B.S. was sitting on one side and defendant was on the other, with the baby in the middle. Partway through the movie, B.S. fell asleep. B.S. was wearing basketball shorts and a T-shirt that she had changed into after they ate Taco Bell in the bedroom.

B.S. woke up to find defendant on top of her trying to take off her clothes. He was holding her arms across her chest. B.S. did nothing; she did not push back. She was in shock. She said nothing. Defendant was facing B.S., holding her wrists across her chest with one hand, and pulling off her shorts with the other. He slid her shorts down one leg and then the other. Defendant pulled B.S.'s underwear down with the shorts. Her shorts and underwear were just below her knees.

Once defendant got her pants far enough down, he put his fingers in her vagina two or three times. Defendant used his knees to push her thighs apart. Defendant used

3

one hand to put his penis inside her vagina. He pushed her arms to the sides of her head. Defendant went back and forth with his penis going in and out of B.S. about 10 times. Defendant pulled out and ejaculated on her stomach. Some ejaculate got on the bed and defendant wiped it up. At one point before he ejaculated, defendant had one hand on B.S.'s neck.

B.S.'s T-shirt stayed on the whole time. She was wearing a sports bra underneath. Her T-shirt got moved upwards a little and defendant touched the top of her chest on the left side. When defendant was on top of B.S., Payton was off to her right on the bed. After defendant ejaculated and cleaned it up, B.S. pulled up her shorts.

Defendant rolled over and went to sleep. B.S. was trying to get Payton to stop screaming. B.S. was so shocked she didn't move or do anything; it almost felt like she wasn't breathing.

B.S. could not fall asleep. She stayed until the morning when her mother picked her up. She did not tell her mother anything.

B.S. told her father in August 2017. It was in the evening. B.S. was at home with her father; her mother was at her grandmother's house. B.S.'s father had seen a picture on her phone. B.S. had received a sexual picture on Snapchat. Her father got angry and yelled at her. Her father called for her mother to come home. They took her phone. B.S.'s father went to the house of the person who sent the picture and came back. B.S. and her father talked about the picture. B.S. told her father she was not a virgin. B.S. was crying. Her father got upset again.

B.S. then told her father what happened with defendant. She felt that, since everything had already come out, she would tell him about defendant. B.S. did not say anything before because she thought it would split the family and it would be her fault. B.S. felt she couldn't hold it anymore; she couldn't sleep and was crying every day.

On cross-examination, B.S. testified that when she stayed over at defendant's house, she typically slept on the couch in the living room or in Taylor's room. B.S. had

4

never slept in defendant's room before that night. The bedroom had no door. The doorway was as wide as two standard sized doors and was covered by a fabric curtain. B.S. had stayed at defendant's house more than 10 times. Taylor frequently asked B.S. to stay the night. She never stayed there unless Taylor was there.

After B.S. reported the incident to her father, the police were contacted and took a statement from her. One of the officers was Deputy Able, who recorded the conversation and asked B.S. to be very descriptive about the incident. B.S. never told Able that defendant jumped on top of her. B.S. did not tell Able that defendant had moved her hands above her head, touched her neck, or put a hand on her chest. B.S. told Able defendant ejaculated on the bed, not on her stomach. B.S. did not tell Able that defendant had cleaned up the bed.

B.S. also gave a recorded statement to a woman B.S. met in Oregon for a CARES assessment.[3] B.S. did not state that defendant had jumped on top of her. B.S. did not say that defendant ejaculated on her stomach or that he cleaned it up. B.S. stated that defendant left the room immediately after the incident, that he pulled up her pants and went upstairs, taking Payton with him because she was screaming. At no point did B.S. try to leave the room. She did not go upstairs to Taylor's room. B.S. did not leave the house until 9:00 a.m. or 10:00 a.m. There were doors leading from the bedroom to the outside. B.S. agreed she could have gone outside. B.S.'s home was about a mile and a half away. B.S. did not leave the house and walk home.

B.S. had her cell phone with her during the incident. She did not call anyone to pick her up. She did not call her parents or anyone, including law enforcement, to tell them what happened.

---

[3] CARES is an acronym for Child Abuse Response and Evaluation Services. (*State ex rel. Juvenile Dept. of Multnomah County v. S.P.* (2008) 218 Or.App. 131, 133, fn. 1 [178 P.3d 318, 319, fn. 1].)

B.S. stayed in the bed the whole night. She stayed the next morning for a while to look after Payton. When her mother picked her up, B.S. did not tell her mother about the rape.

B.S. did not have any sort of injuries. She never went to a hospital to be evaluated.

B.S. testified that defendant never threatened her. He never told B.S. not to tell anyone what had happened.

B.S. first reported the incident to her father in August 2017. When asked, she did not know the actual date when it happened but believed it was in July 2016. B.S. never told Jerilyn or Taylor before then.

When B.S. told her father, it was late at night. Her parents were getting ready to go to bed. Her father had taken her phone to check it, which he did about once a month. Her father found a Snapchat picture from a boy B.S. went to high school with. It was a picture of the boy's penis. B.S.'s father asked if she was sexually active and she admitted she was. When her father had asked previously if she was a virgin, B.S. had lied and said she was.

B.S.'s parents were religious and went to church three times a week. B.S.'s parents were strict and had a lot of rules for her, including curfew and bedtime. She hid from her parents that she had gone to parties, drunk alcohol and smoked.

After B.S.'s father expressed his disappointment with her, B.S. asked if she could tell him something and he wouldn't get mad at her. Then B.S. told him about the rape. B.S. was concerned her father would get mad because she felt disgusted and ashamed, like it was her fault. Her mother wasn't home when she told her father. Her father called her mother, who came home, and they all went to her grandfather's house. Her grandfather suggested calling law enforcement and her mother called.

B.S. did not tell Deputy Able about the circumstances of how she reported the rape, including receiving a Snapchat from a boy, or that her father and mother were upset

6

with her when she disclosed she was sexually active. At the CARES interview in October 2017, B.S. did not tell the interviewer about the circumstances of reporting the rape to her parents. The interviewer asked specifically what made B.S. tell her father and she just said they were having a conversation about sex. B.S. did not tell the interviewer that she was in trouble after receiving a Snapchat photo from a boy or for being sexually active. B.S. told Able that she did not report the incident because defendant was family and had a child. B.S. told the CARES interviewer that she didn't report the incident because B.S. did not think anyone would believe her.

After July 2016, defendant broke up with Jerilyn and moved out of the house. He moved into an apartment. B.S. visited the apartment one time. Jerilyn then moved to a different house. Defendant moved back in with her and the children. B.S. visited this house frequently when she gave Taylor rides home from sports they played together. B.S. would go inside the house. At that time, defendant was living there.

One time B.S. stayed overnight at that house, along with Taylor's father, his wife and their child. B.S. got in trouble because Jerilyn let her take the kids to a hot tub and they came back late. Jerilyn went to bed without telling the others where B.S. and the children had gone. Defendant and Taylor's stepmother were angry with B.S. Taylor's stepmother yelled at B.S. B.S. cried because they were upset with her. That was the last time B.S. had contact with defendant. This was about a month before B.S. reported the rape.

B.S. told the CARES interviewer that B.S. had had only one contact with defendant since the assault, when he attended her basketball game and hugged her though she didn't want to see him. B.S. did not tell the interviewer she had stayed overnight at a house where defendant was living.

One time after the assault B.S. went with Jerilyn and Payton to a softball game where defendant played. Jerilyn and defendant also attended a few of B.S.'s games. Defendant attended a softball tournament in November 2016 where B.S. played, and,

7

afterwards, they all went out for pizza and miniature golf. Defendant helped B.S.'s father coach her softball team in the spring of 2017.

**Heather C.:** Heather C. testified she had known defendant for five years. In 2015, Heather moved in with defendant and his girlfriend Jerilyn and then moved out. In the summer of 2016, Heather and her teenage daughter moved back in with Jerilyn after Jerilyn broke up with defendant. Heather and Jerilyn shared a bedroom downstairs. Defendant visited the house but did not live there.

Once when Heather was living with Jerilyn, she was lying on the bed and defendant showed up. Jerilyn was upstairs. Defendant climbed on top of Heather. She pushed him off. She threatened to kill him. Before she pushed him off, he held her hands by the sides of her head. He was able to do that because that was how she woke up. Defendant told her to shut up. Heather told him to get off, that Jerilyn was upstairs. Heather rolled her body to get defendant off. Defendant was drunk so it was easy to move him.

Heather did not tell anybody. She got up, went upstairs, got her daughter and left. Heather came back to the house but moved out within a month's time.[4]

On cross-examination, Heather was asked about a conversation she had with B.S.'s mother about "things that had happened with me." Defense counsel asked if Heather was referring to the time she woke up with defendant on top of her. Heather said, "No, I was speaking about the time that [defendant] raped me in a car."

Heather reviewed a statement she gave to a detective and testified that it incorrectly stated that the assault where defendant held her hands by her head while on

---

[4]  Heather was the complaining witness on the witness dissuasion charge against defendant (count 3, Pen. Code, § 136.1, subd. (a)(1)). The jury found defendant not guilty on count 3. We omit from our summary of the facts Heather's testimony on that charge as irrelevant to the issues on appeal.

8

top of her took place on a couch when it was in the bed. Heather testified that there were three different assaults: "There was my vehicle, there is the couch and then there was the bed." There was also an incident in a restroom where there was no sexual contact.

Regarding the incident in the car, Heather testified defendant raped her in the passenger side front seat of the car. Defendant was driving; Heather had been drinking. He parked in the parking lot of a park, got on top of Heather on the passenger side, and raped her. Heather testified that she told the detective about the rape in a recorded conversation, where she said defendant reached over and grabbed her chest and said that she was going to have sex with him. Heather did not tell the detective that in that incident she had pulled over and gotten out of the car.

The incident on the couch occurred before the incident on the bed. Heather was sleeping on the couch at Jerilyn's house and defendant got behind her.

All three incidents happened close in time to each other. Heather testified that the details of the incidents tended to "blur together."

Defense counsel examined Heather regarding numerous text messages she exchanged with defendant after the assault in the bed where Heather expressed warm feelings for defendant. In response to the prosecutor's question, Heather confirmed that she had an amicable relationship with defendant after the assault.

**Jeff Moser:** The defense called Detective Jeff Moser, who testified that Heather told him, regarding an incident in a vehicle, that defendant contacted Heather and said he couldn't drive, she picked him up at a bar, she was driving, and defendant reached over and grabbed her chest. Heather never said that defendant climbed on top of her. Heather said that, after defendant grabbed her chest, she pulled over and got out of the car. She did not say that she had been raped.

Regarding the incident on the couch, Heather told Detective Moser that defendant climbed on top of her and tried to take off her clothes. Heather told Moser there were

9

two incidents where defendant tried to climb on top of her but only mentioned the one on the couch. Heather never told Moser that defendant put her arms above her head.

**Jerilyn M.:** Jerilyn, defendant's fiancée, testified that in October 2016 she moved out of her house into an apartment with defendant. B.S. visited there three times. In January 2017, Jerilyn, her children and defendant moved to a larger house. B.S. would frequently visit this house and often stay late. B.S gave Jerilyn's daughter Taylor rides home from softball practices. Defendant was living at the house. Jerilyn observed nothing unusual about interactions between B.S. and defendant. Nothing changed between them from July 2016 to January 2017.

In June 2017, B.S. asked Jerilyn if she could go to one of defendant's softball games out of town. B.S. drove herself to the game.

On July 8, 2017, B.S. stayed at Jerilyn's house. B.S. and Taylor asked for permission to take the children to a hot tub at a property Jerilyn managed. Taylor's father was visiting. Taylor texted that the hot tub was cold so they went to a park and came back late. Jerilyn was sleeping. Defendant yelled at B.S. that it was disrespectful and irresponsible to have the children out late, especially when Taylor's father was visiting.

**Taylor M.:** Taylor testified that defendant is her stepfather. Taylor has known B.S. as a cousin since the fifth grade. Before July 2016, B.S. would not often be at Taylor's house. After July 2016, B.S. would give Taylor rides home from softball practice. B.S. would come inside and hang out with everyone. When defendant was there, B.S. would hang out with him, too. A couple of times B.S. stayed the night with Taylor at the house. They would sleep in the living room on a couch. Taylor did not know of any instance when B.S. slept in defendant and Jerilyn's bed.

Taylor never observed B.S.'s behavior change around defendant. There was nothing unusual about their interactions. B.S.'s behavior with defendant stayed the same throughout the time Taylor knew her.

10

**Barry Norton:** Barry Norton testified that B.S.'s father is his stepson and Barry has a close relationship with B.S., like a granddaughter. B.S.'s family would stop by his house for Christmas. Defendant would be present. Barry has seen B.S. and defendant interact. They were friends. There was nothing unusual about their interactions.

Barry learned that B.S. accused defendant of rape in August 2017 when B.S. and her parents came over to Barry's house after finding out from B.S. At his suggestion, they called law enforcement from his house.

Barry had seen B.S. interact with defendant from July 2016 to the date of the accusation in August 2017. B.S. would come in to say hello when Barry, defendant and other family members were at a pizza parlor watching games. All of them would have conversations as a group. Once, defendant, Barry and others were on their way to a 49ers game and stopped by a softball game where B.S. was playing. Barry has pictures of Christmas 2016 when B.S. and her family came over to his house when defendant was there. In spring of 2017, B.S. and defendant helped clean up the ball field for the girl's high school softball team. Barry never noticed any change in B.S.'s behavior towards defendant after July 2016.

## DISCUSSION

### I

### *Evidence of Prior Sex Offense Admitted under Section 1108*

Defendant contends that the trial court abused its discretion in allowing Heather C. to testify to a prior sex offense, which he argues was shown at a section 402 hearing "to be both demonstrably false and extremely incredible." We find no abuse of discretion. The trial court allowed Heather to testify to an incident where defendant climbed on top of her because it was similar to the rape of B.S. Her credibility regarding this incident was for the jury to determine.

The prosecution moved in limine to admit evidence of prior uncharged sex crimes that defendant (1) groped the clothed breasts of M.W, a minor, and kissed her face and

11

neck, while pinning her to a car, and (2) lay on top of Heather and tried to undress her and, in another incident, groped her breasts.

In a tentative ruling, the court determined that the incident involving M.W. was more prejudicial than probative under section 352, finding that "there's very little similarity" to the assault of B.S. The assault on Heather, the court concluded, had "much more similarity to the current allegations, and my tentative weighing under [section] 352 is that it is . . . proper propensity evidence." The court also observed presentation of this evidence "would take very little time since the witness is going to be on the stand in any event because she's the witness on the dissuading charges."

Defense counsel objected to the evidence because of the low degree of certainty that the incident occurred and significant credibility issues with Heather that the court should consider in determining degree of certainty. The prosecutor's response was the credibility was not for the court to determine. The court scheduled a section 402 hearing, which occurred just before Heather testified.

The prosecution offered only Heather as a witness at the section 402 hearing. Heather testified that she was sleeping downstairs at Jerilyn's house where she shared a bedroom with Jerilyn. Heather woke up to find defendant on top of her. Heather told him to get off because she was going to yell for Jerilyn, who was upstairs. Heather was able to push defendant off and went upstairs. When defendant was on top of Heather, he was trying to push her arms back to the side of her head. Heather thought he was trying to rape her. He had been drinking.

On cross-examination, Heather testified that defendant had made three sexual advances towards her. Heather said the first incident was when defendant raped her in the front seat of her car in a parking lot at a park. Defendant was driving. He climbed over the cup holder, pulled her shorts down and raped her. Heather stated that she gave a statement to Detective Moser that defendant had grabbed her chest, said they were going to have sex, and raped her.

12

The second time was the incident in the bedroom downstairs. In the third incident, Heather was in the bathroom at Jerilyn's house and defendant kept trying to come in. Heather did not tell Moser about the third incident because she thought it was not important. After the second incident, Heather moved out of the house.

Detective Moser testified that he took two statements from Heather. In one statement, Heather reported that defendant asked her to pick him up because he couldn't drive. Defendant reached over and grabbed her breast and said, you're going to have sex with me. Heather did not state that defendant raped her. She did not say they were in a parking lot at a park. Heather stated that she pulled over and kicked defendant out.

Defense counsel requested that the court exclude testimony from Heather. Counsel argued that "obviously the Court is determining the credibility of the witness before the 1108 evidence comes in." Counsel continued that "where there's an extreme credibility issue with the witness the Court can . . . note that that's not probative and that it's more prejudicial. [¶] So in this circumstance [Heather] is for the first time testifying that [defendant] raped her. She's also including details that were not provided to the officer in either of those investigations. [¶] That is an incredibly inflammatory statement that had not been made previously nor provided to the defense, and I think that it's prejudicial."

The court responded that it had no intention of allowing testimony about a rape incident and was not asked to by the prosecution.

Defense counsel responded: "I understand, Your Honor, but I do think it just goes to this witness's creditability [*sic*] as a whole. I think the concern that the defense has is that [Heather] seems like kind of a loose canon [*sic*] on the stand considering she's given statements that have been provided that are very inflammatory. [¶] So I am concerned that any testimony regarding sexual advances would be prejudicial. So I am asking the Court to exclude her testimony regarding that sexual advance."

13

The court ruled: "The only thing that was offered was the first incident in the bedroom she testified to. That's all I would consider. I think under [section] 352 . . . it's certainly more probative than prejudicial as to that incident. [¶] Now, the witness may have other credibility issues, which I'm sure you'll be going into in detail because she's going to be testifying about an attempt to dissuade her and the threats made to her. [¶] So that's where I'm at with that. So I need the witness to be instructed that we're only talking about the one incident in the bedroom unless defense goes into it. They certainly may."

The prosecutor assured the court that the instruction to the witness to limit her testimony to the incident in the bedroom had already been given.

In conclusion, the court reiterated its understanding that the only testimony allowed would be regarding the incident in the bedroom. As to the other incident, "it's certainly under [section] 352 far more prejudicial than probative; but I don't think that credibility is something that I determine."

" 'Evidence Code section 1101, subdivision (a) sets forth the " 'strongly entrenched' " rule that propensity evidence is not admissible to prove a defendant's conduct on a specific occasion.' [Citation.] . . . [¶] Section 1108 'carves out an exception to section 1101.' [Citation.] Section 1108, subdivision (a) provides that '[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352.' [Citation.] Section 352 articulates the general rule that '[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' [Citation.] 'It follows that if evidence satisfies the requirements of section 1108, including that it is not inadmissible under section 352, then the admission of that evidence does not violate

14

section 1101.' [Citation.] The trial court's ruling admitting evidence under these provisions is reviewed for an abuse of discretion. [Citations.]" (*People v. Erskine* (2019) 7 Cal.5th 279, 295-296 (*Erskine*).)

"As to admissibility under section 352, evidence of past sexual offenses proffered under section 1108 requires the court to 'undertake[ ] a careful and specialized inquiry to determine whether the danger of undue prejudice from the propensity evidence substantially outweighs its probative value.' [Citation.] Among the factors to consider are the ' "nature, relevance, and possible remoteness [of the evidence], *the degree of certainty of its commission* and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses." ' [Citations.]" (*Erskine, supra*, 7 Cal.5th at p. 296, italics added.)

" '[T]he Legislature's principal justification for adopting section 1108 was a practical one: By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence. The ensuing trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations. Section 1108 provides the trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes.' " (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1160.) "[T]here is a strong presumption in favor of admitting sexual assault evidence under . . . section 1108 to show propensity to commit charged crimes." (*People v. Merriman* (2014) 60 Cal.4th 1, 62 (*Merriman*).)

Defendant relies on the certainty factor as a basis to argue that the trial court should have determined that Heather's testimony regarding the incident in the bedroom was more prejudicial than probative given her general lack of credibility and inclination

15

to make inflammatory statements.[5]  Defendant acknowledges that in *People v. Cudjo* (1993) 6 Cal.4th 585 (*Cudjo*), the California Supreme Court held that "[e]xcept in these rare instances of demonstrable falsity, doubts about the credibility of the in-court witness should be left for the jury's resolution" and do not constitute grounds to refuse to admit evidence.  (*Id.* at p. 609; see also *People v. Hovarter* (2008) 44 Cal.4th 983, 996 [rejecting contention that witness's testimony should have been excluded as "inherently unreliable," because "his testimony was not 'so inherently incredible, so contrary to the teachings of basic human experience, so completely at odds with ordinary common sense, that no reasonable person would believe it beyond a reasonable doubt,' " quoting *United States v. Chancey* (11th Cir. 1983) 715 F.2d 543, 546]; *People v. Ennis* (2010) 190 Cal.App.4th 721, 728 [rejecting contention that sexual molestation conviction should be reversed because testimony of main witnesses " 'was unworthy of belief,' " citing *Cudjo*].)

More to the point, in *Merriman*, the California Supreme Court upheld the trial court's decision to admit testimony under section 1108 regarding a prior uncharged sexual offense, finding that the incident involved was significantly similar to the charged offense and determining that the probative value of the evidence was not outweighed by its prejudicial effects.  (*Merriman, supra*, 60 Cal.4th at p. 57.)  Pointing to the witness's

---

[5]     The Attorney General contends that (1) defendant forfeited the issue on appeal because defense counsel did not object and seek an admonition when Heather answered a question about whether a discussion with B.S.'s mother pertained to the sexual assault in the bed by referring to the incident in her car, and (2) invited error by asking about that question in the first place, which was likely to trigger the response that Heather gave.  We disagree.  After Heather brought up her claim that defendant raped her in a car, there was an unreported bench conference.  The record is therefore silent regarding what defense counsel may have requested from the court before soldiering on, so to speak, to present Detective Moser as the first defense witness to impeach Heather.  To the extent Heather took the opportunity of defense counsel's question about one sexual assault to raise another that the court had instructed her not to mention, this was not invited error.

16

"heavy drug use" and long delay in reporting the incident, the defendant asserted "her recollection of these events was so vague, disjointed, and inherently unreliable as to be inadmissible on that ground alone." (*Ibid.*) The court held: "It is well settled, however, that the reliability of a witness's testimony is a matter for the jury to decide and therefore concerns the weight of the evidence, and not its admissibility." (*Ibid.*)

Defendant cites *People v. Chapman* (1975) 50 Cal.App.3d 872, 881, and *People v. Blankenship* (1985) 167 Cal.App.3d 840, 849, as examples where the court excluded witness testimony that lack credibility. However, defendant acknowledges that *Cudjo* distinguished these decisions on their facts. In *Cudjo*, the court observed that, unlike *Chapman* and *Blankenship*, "nothing in the record indicates that [the witness's] testimony was motivated by threats or bribery or expectation of personal advantage." (*Cudjo, supra*, 6 Cal.4th at p. 610.) Here, there is also nothing in the record to exclude Heather's testimony on that basis.

Defendant also cites *People v. Love* (1977) 75 Cal.App.3d 928, where, citing *Chapman*, the appellate court said that the trial court exercising its discretion under section 352, "in weighing 'probative value' necessarily considers, among other things, credibility of the witness who testifies to the proffered evidence." (*Love*, at p. 939.) Defendant argues that the holdings in *Chapman*, *Blankenship*, and *Love* "have never been overruled or disapproved."

But, in *Vorse v. Sarasy* (1997) 53 Cal.App.4th 998, the court considered "how far a trial court may go in assessing the credibility of proffered testimony during a section 352 analysis without overstepping the jury's role as fact finder." (*Id.* at p. 1007.) The court held the trial court erred in striking testimony it found "untruthful," and therefore of limited probative value. (*Id.* at pp. 1007, 1009.) The court said: "Such an analysis overlooks the essential differences between the roles of judge and jury. It is axiomatic that questions of credibility are exclusively within the province of the jury. [Citations.] The court may not set itself up as a gatekeeper excluding otherwise competent and

17

relevant evidence simply because the court finds it unbelievable." (*Id.* at p. 1009; see also *People v. Alcala* (1992) 4 Cal.4th 742, 790 ["the circumstance that [a witness's] testimony readily was subject to impeachment did not afford the court a legitimate basis for excluding this evidence"].) The court in *Vorse, supra*, 53 Cal.App.4th at pages 1011-1012, carefully considered *Chapman*, *Love*, and *Blankenship* and concluded the reasoning in those cases was contrary to the California Supreme Court's analysis in *Cudjo* and *Alcala*: "Rejecting the section 352 analysis of the courts in *Chapman, Love,* and *Blankenship*, we instead follow the Supreme Court's more recent reasoning. A trial court may exclude the live testimony of a witness whom the court disbelieves only in 'rare circumstances of demonstrable falsity.' [Citation.] The court may not exclude evidence when the court simply does not believe the testifying witness. [Citation.]" (*Id.* at pp. 1012-1013, citing *Cudjo, supra*, 6 Cal.4th at p. 609 & *Alcala, supra*, 4 Cal.4th at pp. 790-791.)

We recognize that Heather testified much as defense counsel feared, ignoring the direct instruction of the court regarding the limits of her testimony. Nevertheless, as the trial judge correctly observed, it was not for the court to exclude her testimony under section 352 because of lack of credibility.

II

*Consecutive Sentences*

Defendant contends the trial court abused its discretion in imposing consecutive, six-year sentences for forcible rape (count 1, Pen. Code, § 261, subd. (a)(2)) and forcible sexual penetration (count 2, Pen. Code, § 289, subd. (a)(1)). We find no abuse of discretion.

Under Penal Code section 667.6, subdivision (c), the trial court has discretion to impose a full consecutive term for each of defendant's sex offenses "if the crimes involve the same victim on the same occasion." In making this determination, the court is guided by the criteria in aggravation or mitigation set forth in California Rules of Court, rule

18

4.425, which incorporates rules 4.421 and 4.423.  (Cal. Rules of Court, rule 4.426(b); *People v. Quintanilla* (2009) 170 Cal.App.4th 406, 411 (*Quintanilla*).)**6**  Only one fact in aggravation is required to impose consecutive sentences.  (*Quintanilla*, at p. 413.)

In imposing consecutive sentences, the trial court found as factors in aggravation that the crime involved great violence (rule 4.421(a)(1)), the victim was particularly vulnerable (rule 4.421(a)(3)), defendant took advantage of a position of trust (rule 4.421(a)(11)) and defendant engaged in violent conduct that is a danger to society (rule 4.421(b)(1)).  Of particular concern to the court was that "defendant took advantage of a position of trust."

Defendant focuses on the vulnerability of the victim factor.  " 'As used in the context of rule 4.421(a)(3), a "particularly vulnerable" victim is one who is vulnerable "in a special or unusual degree, to an extent greater than in other cases.  Vulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act. . . ." [Citation.]' [Citation.]" (*People v. Esquibel* (2008) 166 Cal.App.4th 539, 558.)  Defendant asserts that B.S. was not particularly vulnerable because she was almost 16 at the time of the sexual assaults, "not particularly weak or sexually innocent," i.e., athletic and sexually active, and the circumstances of the crime did not indicate vulnerability, in that B.S. was familiar with defendant's girlfriend's home, whose daughter Taylor, B.S.'s close friend, was at home at the time, B.S. went to sleep after the assault in the bed with defendant, had her cell phone with her, did not go to Taylor's room or go home afterwards, and subsequently continued to interact with defendant and attended his softball games.  Tellingly, defendant does not question the court's application of the abuse of trust factor in imposing consecutive sentences.

---

**6**       All references to rules are to the California Rules of Court.

We conclude that, at a minimum, the trial court properly applied the vulnerability and abuse of trust factors. (*Quintanilla, supra*, 170 Cal.App.4th at p. 413.) B.S. was close with defendant. Their families were close. Defendant was her uncle but close enough in age that she considered him like a brother. He went to her softball games and she went to his. As with the defendant in *Quintanilla*, " '[t]his is a person she had no reason to be afraid of.' " (*Id.* at p. 412.) That B.S. felt comfortable sitting on a bed with her uncle and his infant daughter to watch a movie shows that she was particularly unguarded and accessible and that defendant took advantage her trust. (*Id.* at p. 413.) Her unwillingness to report or even react publicly to defendant's sexual assault is only further evidence of the close family relationship that defendant exploited. As B.S. testified, she did not reveal the assault because she was afraid it would split up the families.

Defendant argues the trial court abused its discretion in applying the great violence (rule 4.421(a)(1)) and violent conduct posing a danger to society (rule 4.421(b)(1)) aggravating factors. We need not address these arguments because the trial court reasonably concluded that B.S. was vulnerable and defendant took advantage of her trust. (*Quintanilla, supra*, 170 Cal.App.4th at p. 413.)

Defendant also asserts that the trial court insufficiently considered mitigating factors as balanced against aggravating factors. Rule 4.423 sets forth mitigating factors. The only applicable factor found in rule 4.423(b)(1) was that defendant had no prior criminal record, which the trial court duly considered. Defendant maintains the court should have considered in mitigation his age (24 years), and that he worked full time and supported his fiancée and her five children, as well letters from his aunt, employer and community members attesting to his good character. The court did observe that "I have read some very good letters from the community, better than many I've seen," but declined to find any other factors in mitigation.

We conclude the mitigating circumstances were weak as compared to the strong factors in aggravation. (*Quintanilla, supra*, 170 Cal.App.4th at p. 414.) There was no abuse of discretion in imposing consecutive sentences. (See *People v. Belasco* (1981) 125 Cal.App.3d 974, 984-985.)

III

*Fees, Fines and Costs*

Defendant challenges fees and fines imposed by the trial court at sentencing on the ground that the court failed to determine his ability to pay them. Defendant requests that we remand for resentencing or strike such fees and fines.

The legislative landscape regarding fees and fines changed while this appeal was pending. The Legislature passed Assembly Bill No. 1869, which adopted Penal Code section 1465.9 (Stats. 2020, ch. 92, § 62), amended by Assembly Bill No. 177 (Stats. 2020, ch. 257, § 35),[7] and Government Code section 6111[8] (Stats. 2020, ch. 92, § 11).

---

[7] Penal Code section 1465.9, subdivision (a), provides: "The balance of any court-imposed costs pursuant to Section 987.4, subdivision (a) of Section 987.5, Sections 987.8, 1203, 1203.1e, 1203.016, 1203.018, 1203.1b, 1208.2, 1210.15, 1463.07, 3010.8, 4024.2, and 6266, as those sections read on June 30, 2021, shall be unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated."

Assembly Bill No. 177 amended Penal Code section 1465.9 by adding subdivision (b), which provides: "On and after January 1, 2022 the balance of any court-imposed costs pursuant to Section 1001.15, 1001.16, 1001.90, 1202.4, 1203.1, 1203.1ab, 1203.1c, 1203.1m, 1203.4a, 1203.9, 1205, 1214.5, 2085.5, 2085.6, or 2085.7, as those sections read on December 31, 2021, shall be unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated."

[8] Government Code section 6111 provides: "(a) On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to Section 27712, subdivision (c) or (f) of Section 29550, and Sections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated.

"(b) This section shall become operative on July 1, 2021."

These statutory provisions rendered a number of the fees, fines and costs imposed by the trial court in this case unenforceable and uncollectible and require that any portion of the judgment imposing these costs be vacated. As relevant here, under Penal Code section 1465.9, subdivision (a), the legal assistance fee of $9,750 (Pen. Code, § 987.8), and the cost of the presentence report of $420 (Pen. Code, § 1203.1b) are unenforceable and uncollectible.[9] Under Government Code section 6111, subdivision (a), the balance of the administrative booking fee of $148 (Gov. Code, § 29550) is unenforceable and uncollectible.

Penal Code section 1465.9 and Government Code section 6111 provide that the enumerated fees, fines and costs may not be collected after July 1, 2021. Therefore, these statutes by their express terms apply retroactively to July 1, 2021, and we need not apply the presumption of retroactivity (see *In re Estrada* (1965) 63 Cal.2d 740) to the ameliorative changes in the law made by Assembly Bill No. 1869. (See *People v. Greeley* (2021) 70 Cal.App.5th 609, 625-627 (Greeley); *People v. Clark* (2021) 67 Cal.App.5th 248, 259-261.)

Moreover, "[i]n addition to making any unpaid portion of the identified assessments void by operation of law, however, the plain language of Government Code

---

**9**     Assembly Bill No. 177 added subdivision (b) to Penal Code section 1465.9, which includes a restitution fine under Penal Code section 1202.4. However, in enacting Assembly Bill No. 177, the Legislature sought to "eliminate the range of administrative fees that agencies are authorized to impose to fund elements of the criminal legal system and to eliminate all outstanding debt incurred as a result of the imposition of administrative fees." (Stats. 2021, ch. 257, § 2.) Accordingly, Assembly Bill No. 177 repeals and re-enacts Penal Code section 1202.4 but eliminates former subdivision (l), which authorized a county's board of supervisor to impose a fee to cover the cost of collecting the restitution fine. (Stats. 2021, ch. 257, § 20.) Therefore, we construe subdivision (b) of Penal Code section 1465.9 to render unenforceable and uncollectible only this administrative fee. Since defendant's sentence did not include an administrative fee, he is not entitled to relief under this provision.

section 6111 and Penal Code section 1465.9 not only authorizes, but mandates, vacation of a portion of a judgment for the purpose of striking the now-unauthorized assessments . . . . Specifically, after declaring that the identified fees are now 'unenforceable and uncollectible,' the relevant statutes then state, '*and* any portion of a judgment imposing those costs *shall be vacated.*' (Gov. Code, § 6111, subd. (a), italics added; Pen. Code, § 1465.9, subd. (a), italics added.)" (*Greeley, supra*, 70 Cal.App.5th at p. 626; *People v. Lopez-Vinck* (2021) 68 Cal.App.5th 945, 953.) Accordingly, the unpaid balance the legal assistance fee, presentence report cost and administrative booking fee must be vacated.

Defendant contends that imposing *any* fees and fines "absent an ability to pay determination violates due process under the state and federal constitutions." Defendant relies on *People v. Dueñas* (2019) 30 Cal.App.5th 1157. The Attorney General argues that defendant forfeited any claim based on *Dueñas* by failing to object at sentencing and, if not forfeited, the claim fails on the merits. At sentencing, the only mention of defendant's ability to pay was defense counsel's request, regarding legal assistance fee, that the trial court "consider [defendant's] ability to pay considering the lengthy state prison sentence" imposed and "the situation with his fiancée and their children." Defendant's challenge to the legal assistance has been made moot by the adoption of Penal Code section 1465.9. However, defendant's failure to object to any other fees forfeits a challenge to them on appeal. (See *People v. McCullough* (2013) 56 Cal.4th 589, 591; *People v. Aguilar* (2015) 60 Cal.4th 862, 864 (*Aguilar*); *People v. Trujillo* (2015) 60 Cal.4th 850, 853-854 (*Trujillo*).) Further, a defendant, as here, whose sentencing hearing took place after *Dueñas* was decided forfeits a claim based on that case on appeal by failing to object to the imposition of fees, fines, and assessments at sentencing based on inability to pay. (See *Greeley, supra*, 70 Cal.App.5th at p. 624.)

We reject defendant's attempt to avoid forfeiture by claiming ineffective of assistance of counsel. "Ineffective assistance of counsel is particularly difficult to demonstrate on direct appeal, where we are limited to the record from the trial court.

23

'The appellate record . . . rarely shows that the failure to object was the result of counsel's incompetence; generally, such claims are more appropriately litigated on habeas corpus, which allows for an evidentiary hearing where the reasons for defense counsel's actions or omissions can be explored.' [Citation.] ' "Unless a defendant establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of professional competence . . . . ' " ' [Citation.] ' "If the record 'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected '. . . unless there simply could be no satisfactory explanation.' " ' " (*People v. Acosta* (2018) 28 Cal.App.5th 701, 706.)

We cannot say there is no satisfactory explanation for defense counsel's limited request that the court consider defendant's ability to pay the legal assistance fees. We join many other appellate courts concluding in decisions issued at the time of defendant's sentencing that *Dueñas* is without merit. (See, e.g., *People v. Kingston* (2019) 41 Cal.App.5th 272, 279; *People v. Hicks* (2019) 40 Cal.App.5th 320, 326, review granted Nov. 26, 2019, S258946; *People v. Aviles* (2019) 39 Cal.App.5th 1068-1069; *People v. Caceres* (2019) 39 Cal.App.5th 917, 928.) Failure to assert a meritless position does not demonstrate ineffective assistance of counsel. (*People v. Kipp* (1998) 18 Cal.4th 349, 377.) Our conclusion that *Dueñas* is without merit invalidates defendant's ineffective assistance of counsel claim on this issue.

IV

*Correction to Abstract of Judgment*

Lastly, defendant contends that the abstract of judgment contains a clerical error that should be corrected. The Attorney General does not object. We will modify the judgment accordingly.

The jury found defendant guilty of forcible sexual penetration of a child over 14 (Pen. Code, § 289, subd. (a)(1)(C)). The midterm for this offense is eight years. However, due to an instructional error, the court decided to impose a midterm sentence of

six years under Penal Code section 289, subdivision (a)(1)(A). The jury instruction on the elements of this crime inadvertently omitted the age of the victim. This omission led defendant to file a motion for a new trial or alternatively for a lesser sentence without the age element. The trial court granted the motion, modifying the verdict to impose the lesser sentence. (Pen. Code, § 289, subd. (a)(1)(A).)

However, the abstract of judgment continues to identify the sentence as imposed under Penal Code section 289, subdivision (a)(1)(C), instead of section 289, subdivision (a)(1)(A). Accordingly, we will direct the court to issue an amended abstract of judgment correcting the error. (*People v. Mitchell* (2001) 26 Cal.4th 181, 186-187 [appellate court may order correction of clerical errors reflected in abstract of judgment].)

## DISPOSITION

The portion of the fees and cost imposed by the court under Penal Code sections 987.8 and 1203.1b and Government Code section 29950 that remains unpaid as of July 1, 2021, is vacated. As so modified, the judgment is affirmed. The court is directed to amend the abstract of judgment to reflect the vacatur of any balance of the fees and cost imposed under Penal Code sections 987.8 and 1203.1b and Government Code section 29950 that remains unpaid as of July 1, 2021, and to correct the reference to the sentence on count 2 to state that it is imposed under Penal Code section 289, subdivision (a)(1)(A), and forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

/s/
RAYE, P. J.

I concur:


/s/
HOCH, J.

25

MAURO, J., Concurring and Dissenting.

I fully concur in the majority opinion except for the portion of the Discussion pertaining to defendant's challenge to the imposed fines and assessments, as to which I dissent in part.

In *People v. Dueñas* (2019) 30 Cal.App.5th 1157, the court held it is improper to impose certain fines or assessments without determining defendant's ability to pay. (*Id*. at pp. 1168, 1172.) Although some courts have subsequently criticized *Dueñas*'s legal analysis (see, e.g., *People v. Hicks* (2019) 40 Cal.App.5th 320, review granted Nov. 26, 2019, S258946), *Dueñas* remains citable precedent. Until the California Supreme Court has had an opportunity to resolve the current split in authority, I believe it is appropriate in certain cases to remand the matter to give the trial court an opportunity to consider defendant's ability to pay.

Here, defendant's November 15, 2019 sentencing occurred after *Dueñas* was decided, but defendant's counsel did not assert *Dueñas* at the sentencing hearing. Accordingly, an ability to pay challenge is forfeited regarding the fines and assessments. Nevertheless, because defendant now asserts ineffective assistance of counsel, I would remand the matter and direct the trial court to assess defendant's ability to pay the fines and assessments.

                                               /s/
                                      MAURO, J.

1